**VERMONT SUPREME COURT**
109 State Street
Montpelier VT 05609-0801
802-828-4774
www.vermontjudiciary.org

Case No.      23-AP-002



*Note: In the case title, an asterisk (\*) indicates an appellant and a double asterisk (\*\*) indicates a cross-appellant.  Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

SEPTEMBER TERM,   2023

| | |
|---|---|
| Richard LaRoche v. Darla Sterett (LaRoche)\* | APPEALED FROM: |
| | Superior Court, Windsor Unit, Family Division |
| | CASE NO. 317-9-14 Wrdm |
| | Trial Judge: John R. Treadwell |

In the above-entitled cause, the Clerk will enter:

Defendant Darla Sterett appeals a decision by the family division of the superior court granting plaintiff Richard LaRoche's motion to modify his spousal maintenance obligation.  We reverse and remand for further proceedings.

The parties were divorced in 2015 after a thirty-five-year marriage.  They have three adult children.  The final divorce order, which was based on the parties' stipulation, required plaintiff to pay defendant $4,366.67 each month until December 2027, or when defendant retired or either party died, whichever occurred first.  The amount of maintenance was to be adjusted yearly based on inflation.  The parties agreed that the maintenance award was permanent and entirely compensatory in nature.

In March 2022, plaintiff moved to modify the maintenance award.  In response, defendant moved for the court to enforce the maintenance award and to hold plaintiff in contempt.  The court held a hearing on the motions in July 2022 and issued a written order containing the following findings.

Plaintiff is sixty-four years old and has an M.S. and a Ph.D. in chemical engineering.  At the time of the divorce, plaintiff was the CEO of a small engineering software firm called DEM Solutions, Ltd.  He joined the firm in 2007 as the global director of engineering.  In 2008, he became the vice president of engineering and U.S. general manager, and in 2015, he became the CEO.  Plaintiff was terminated from the CEO position in January 2019.  He remained an advisor to the firm's board until July 2019.  From July to December 2019, he collected unemployment.  He continued to make maintenance payments to defendant during this period using his retirement funds.

In December 2019, plaintiff began working for a firm called Exponent as a senior chemical engineering consultant and manager.  In November 2020, plaintiff was terminated due

to the business consequences of the pandemic. Beginning in October 2020, plaintiff made substantial efforts to obtain employment in the fields in which he had worked. He hired an executive coaching and networking firm for $11,000. He treated his job search as a full-time job and attended webinars and engaged in networking opportunities.

In January 2022, plaintiff began collecting Social Security benefits. He stopped paying maintenance to defendant after that month.

In March 2022, plaintiff contracted with Hexagon Manufacturing Intelligence, Inc., to be a reseller of computational fluid dynamics software. Plaintiff had last worked with such software in 2007. Plaintiff was not an employee of Hexagon. He bore the costs associated with the sales and would only get paid if he made sales. The court found that plaintiff had no history of working in sales. As of the July 2022 hearing, plaintiff had received no income from Hexagon.

Defendant is sixty-one years old and has a B.S. in elementary education. She worked as a teacher in Illinois while plaintiff finished his graduate education. After the parties moved to Vermont in 2001, defendant started working as a paraprofessional in a local school. In 2008, she worked as a school receptionist. In 2018, she worked at a school outside the area. In 2019 she returned to local schools and was granted a temporary teaching license. Since 2021, she has worked as a long-term substitute and paraprofessional. Her monthly income was $2105. She intended to work until 2027 and take Social Security benefits at that time.

The court found that plaintiff had demonstrated a real, substantial, and unanticipated change in circumstances that warranted modification of the spousal maintenance award due to the loss of his employment and subsequent reduction in income. The court found that plaintiff was unable to use the knowledge or skills he developed during the marriage. Because the parties agreed that the spousal maintenance award in this case was permanent and entirely compensatory in nature, the court concluded that the entire award was subject to downward modification and reduced the spousal maintenance obligation to zero. The court rejected defendant's claim that plaintiff had available funds to continue to pay the maintenance obligation in the form of retirement assets. The court partially granted defendant's motion to enforce, concluding that plaintiff owed maintenance payments for February and March 2022. Defendant appealed to this Court.

The family court may modify a maintenance award, whether based on stipulation or judgment, if it finds that there has been a "real, substantial, and unanticipated change in circumstances." 15 V.S.A. § 758. The court has broad discretion in modifying maintenance, but "this discretion is not unlimited." Stickney v. Stickney, 170 Vt. 547, 548-49 (1999) (mem.). When reviewing the court's order, we will uphold findings of fact unless they are clearly erroneous. Id. at 548.

Defendant concedes that plaintiff's loss of employment constituted a real, substantial, and unanticipated change in circumstances sufficient to justify modifying the spousal maintenance portion of the final divorce order. Defendant argues, however, that the court erred in finding that plaintiff's new job was entirely unrelated to his prior work experience and in relying on that finding to reduce the spousal maintenance obligation to zero. We agree that the court's decision was inconsistent with our law regarding compensatory maintenance awards.

In Weaver v. Weaver, 2017 VT 58, 205 Vt. 66 [Weaver I], we explained that the compensatory component of a permanent maintenance award is intended to reimburse the

2

recipient spouse for diminished earning capacity and career prospects resulting from that spouse's nonmonetary contributions to the home and family. Id. ¶ 23. Accordingly, when seeking modification of such an award "the obligor spouse must make a showing that he or she is no longer able to benefit from the recipient spouse's contributions because of a change in circumstances in order to justify a downward modification of the compensatory aspect of the permanent award." Id. ¶ 26. For example, "the obligor doctor who suddenly becomes unable to practice medicine because of an unexpected medical condition that removes her vision or the obligor machinist whose career is suddenly terminated with the advent of a new technology that moots his specialized work could be entitled to a downward modification." Id. Applying these principles, we reversed the family court's order reducing the obligor spouse's maintenance obligation to zero based on his changed financial circumstances because the court did not address whether the "husband's inability to pay was the product of an unexpected change that rendered him unable to reap the benefits of wife's contributions to the marriage." Id. ¶ 29.

After we remanded in Weaver I, the family court reduced the compensatory portion of the maintenance award to zero, finding that the husband was no longer benefitting from the wife's homemaking contributions during the marriage. We reversed that determination in Weaver v. Weaver, No. 2017-414, 2018 WL 2106377, at *3 (Vt. May 4, 2018) [Weaver II]. We rejected the family court's reasoning that due to changes in the husband's former field of telecommunications "and husband's need to acquire skills in another line of work, husband is no long[er] benefiting from wife's nonmonetary contributions during the marriage." Id. Because the evidence showed that the husband continued to apply the experience and skills he acquired during the marriage, which included "account management, product launch and marketing, business development, competitive marketing positioning, and leadership and team building" in his new position in a different field, we concluded that the court erred in finding that husband was no longer benefitting from wife's homemaking contributions. Id. at *4. We held that "the fact that husband's lack of technical knowledge in a changing telecommunications field required him to take a new direction and search for work in a new field is not the type of extreme situation, beyond being unable to work or reaching retirement, that would permit the court to reduce the compensatory component of the maintenance award." Id. *4.

This case is similar to Weaver II and requires reversal for the same reasons. Here, the family court found that "plaintiff's current position in sales does not utilize the knowledge or skills he developed during the marriage," and therefore he was "no longer able to reap the benefits of defendant's contribution to the marriage." This finding was clearly erroneous. The court's findings and the record show that during the parties' marriage, plaintiff obtained advanced degrees in chemical engineering and steadily advanced in his career in that field. His new job at Hexagon involved selling chemical engineering software. Plaintiff testified that he worked with his new employer and got to know its executives when he was employed at DEM Solutions, a job he held during the marriage. He offered to be a Hexagon reseller as a way to "try and generate income based on my industry knowledge." He had worked with the type of software he was selling in a previous job during the marriage, though the specific product was new to him. He testified that he was using his business network of 800 to 900 contacts that he had developed over thirty years in the industry to try to sell the software. His resume states that he had successfully worked with sales departments to increase sales. Thus, while it was true that plaintiff had not worked as a salesperson, the evidence shows that he was using his experience, technical knowledge, and contacts he had developed during the marriage in his new job.

As in Weaver II, this is not a situation where plaintiff was unable to work due to a serious medical condition or a change in technology that deprived him of specialized work. Cf. Weaver

3

I, 2017 VT 58, ¶ 27 (giving examples of situations that could justify downward modification of compensatory portion of maintenance award). "Rather, this is a common situation where technological changes in the market required that husband make adjustments in applying his skills and experience to new work in a new field." Weaver II, 2018 WL 2106377, at *3. Plaintiff retained the benefit of his part of the marital bargain—that is, "increased earning potential in part related to [defendant's] contributions for which she is receiving a compensatory component of permanent maintenance"—and therefore remains obliged to pay compensatory maintenance. Weaver I, 2017 VT 58, ¶ 29.

"If the potential benefit to the obligor remains, but the obligor has lost his or her current ability to pay the compensatory portion of the award, that portion of the maintenance debt accrues." Weaver I, 2017 VT 58, ¶ 27. Accordingly, on remand the court must calculate any arrearage owed by plaintiff.

Reversed and remanded for further proceedings consistent with this decision.

BY THE COURT:

Paul L. Reiber, Chief Justice

Harold E. Eaton, Jr., Associate Justice

Karen R. Carroll, Associate Justice

4